IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 22-cr-00145-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

LEON ASKEW,

    Defendant.

## RESPONSE TO THE DEFENDANT'S MOTIONS TO SUPPRESS STATEMENTS [ECF 20 AND 21]

The United States of America, by Cole Finegan, United States Attorney for the District of Colorado, and Albert Buchman, Assistant United States Attorney, respectfully submits the following response in opposition to the defendant's Motion to Suppress Mr. Askew's Unwarned Statements, ECF 20, and Motion to Suppress Mr. Askew's Involuntary Statements, ECF 21. Because both motions seek to suppress the same statements, the government submits one response to both.

## FACTS

On January 31, 2022, the defendant, a commercial aviation passenger, entered a Transportation Security Administration (TSA) checkpoint at the Colorado Springs Airport. The defendant was seeking entry to the "sterile area" of the checkpoint so that he could board Frontier flight number 2823 which was scheduled to depart for Phoenix, Arizona.

*See* Ex. 7 (boarding pass).[1] The defendant entered TSA's Advanced Image Technology (AIT) machine which screened his person. The defendant exited the AIT, and a TSA Transportation Security Officer (TSO) conducted a pat-down of the defendant in order to resolve an alarm noted by the AIT. *See* Ex. 1 (12:17:36- 12:20), and 3 (same).

Concurrently, TSO N.K. operated the x-ray machine to conduct the routine screening of all passengers', including the defendant's, carry-on luggage. He observed on the x-ray screen what appeared to a handgun inside the bag the defendant had presented to TSA. *See* Exs. 1, 3, 4, 6 (x-ray image). Several other TSOs approached and examined the screen, Ex. 1 (12:19:35), leading to a call to Colorado Springs Police Department officers (local police) assigned to the airport, Ex. 4, p. 2. Section 1542.215 of Chapter 49 of the Code of Federal Regulations requires law enforcement personnel be available to respond to the TSA checkpoint in support of security issues, and Colorado Springs Airport policy requires state police officers to seize firearms. During this time, the defendant waited for his bag to exit the X-ray machine. *See* Ex. 3 (12:19:35-12:25:08).

---

[1] All exhibits have been approved by TSA as not containing Sensitive Security Information per 49 C.F.R. §§ 1520, *et. seq*. All exhibits will be conventionally filed.

 Exhibit 1 is closed-circuit television camera footage focused directly on security line. The defendant is wearing a green jacket and a tan hat. This footage ends at 12:22. Discovered at inv_69.

 Exhibit 2 is closed-circuit television camera footage focused on the security line after the defendant has left the private room. This footage starts at 12:32. Discovered at inv_70.

 Exhibit 3 is closed-circuit camera television footage focused on the entirety of the security checkpoint and covers the entirety of events. Discovered at inv_68.

 Exhibit 4 is reports from TSOs N.K. and G.B. Discovered at inv_449 and inv_452.

 Exhibit 5 is reports from police Officers Joachim Schmeiler and Eric Reed and two follow-up interviews with Officer Schmeiler conducted by TFO Exley. Discovered at inv_5, inv_17, inv_450, and inv_459.

 Exhibit 6 is an x-ray image and photos taken by TSA. Discovered at inv_453.

 Exhibit 7 is the defendant's boarding pass. Discovered at inv_456.

Approximately seven minutes after the bag was examined by x-ray, Colorado Springs Police Department Officers Eric Reed and Joachim Schmeiler arrived. Exs. 1 (12:17:52, TSO N.K. radios upon observation), 3 (12:24:46-12:25:08). TSO N.K. allowed them to see the x-ray screen, where they also observed the handgun and an extra magazine in the bag. Ex. 5. Officer Schmeiler contacted the defendant, advising him the handgun would be seized. *See id*. The officer obtained the bag, and both officers and TSO G.B. escorted the defendant to an airport "private screening room" near the open security area at approximately 12:25 pm. *See* Exs. 3 (12:25:08-12:25:36); 4, p. 2*.*

Unlike for the security checkpoint lanes, there was no surveillance camera in the private room. Officer Reed confirmed the defendant's identity and contact information, and Officer Schmeiler removed the handgun and two loaded magazines from the bag. Ex. 5.

<u>The statements at issue</u>: Officer Schmeiler asked why the gun was in the bag, and the defendant stated he works for the American Eagle Security Company and forgot the gun was in his bag. *Id.*, pp. 2, 4; Ex. 4, p. 5. During the brief conversation, Officer Schmeiler advised him no further enforcement action would be taken pending further review by TSA. Ex. 5, pp. 2, 4, 7. The defendant asked what would be required to get the weapon back, and he was told a criminal history check had to be conducted. *See* Exs. 4, 5, p. 2. The defendant was in the private room with the officers for approximately seven minutes, and the door to the room appears to have remained open during the interaction. *See* ECF 3 (the defendant is escorted 12:25:11, the defendant enters the room at 12:25:28, TSO G.B. entered at 12:25:36, TSO G.B. exited carrying the bag at 12:30:41, and the defendant and local police exit at 12:30:58).

At approximately 12:30 p.m., the defendant, the officers, and TSO G.B. exited the room, with G.B. carrying the defendant's bag. *Id.* As the defendant watched, TSO G.B. then conducted an additional check of the bag in the security checkpoint area. Ex. 2. (12:23:39, from the footage TSO G.B. is unarmed). The defendant was then given back his bag without the firearm and ammunition, and was allowed to board flight. *See* Exs. 2 (12:34:40); 4, p. 2; 5, p. 4.

Bureau of Alcohol, Tobacco, Firearms, and Explosives Task Force Officer Derek Exley later checked the defendant's criminal history and determined he was a felon. *See* Ex. 5, p. 8.

## **THE DEFENDANT WAS NOT IN CUSTODY**

In his motion to suppress unwarned statements, the defendant claims he was subjected to a custodial interrogation without a warning prescribed in *Miranda v. Arizona*, 384 U.S. 436 (1966). ECF 20, p. 4. There is no dispute that he was not provided *Miranda* warnings before being questioned. The government asserts, however, that the defendant has not established his burden to show illegality, as the objectively considered circumstances indicate that he was not in custody.

I.

"[P]olice officers are not required to administer *Miranda* warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). *Miranda* warnings must be given only if a subject is "in custody" and subject to "interrogation." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990). Although the Tenth Circuit has not directly ruled on the matter, courts generally hold that the defendant shoulders the burden to show that he was subjected to custodial interrogation. *United States v. Jorgensen*, 871 F.2d 725, 729 (8th

4

Cir.1989) (defendant "failed to demonstrate that he was subjected to custodial interrogation"); *United States v. Davis*, 792 F.2d 1299, 1309 (5th Cir.1986) (defendant had "the burden of proving that he was under arrest or in custody").

A person is considered in "custody" when "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Howes v. Fields*, 565 U.S. 499, 509 (2012). In applying this test, courts must examine "all of the circumstances surrounding the questioning," including several well-established factors: (1) whether the suspect is made aware that he is free to refrain from questioning or end the interview; (2) the location of questioning; (3) its duration, nature of questioning, where accusatory or coercive; (4) statements made during interview; (5) presence of physical restraints or weapons during the questioning; and (6) the release of the interviewee at the end of questioning. *Howes*, 565 U.S. at 509; *United States v. Jones*, 523 F.3d 1235, 1239-40 (10th Cir. 2008).

II.

Here, the defendant has not established his burden to show he was in custody. The factors above, when objectively considered, indicate that the defendant's freedom of action was not restrained and no *Miranda* advisement was needed.

First, on first contact, the local officers merely advised that they would be seizing the handgun, not that they would be detaining him. Ex. 5, p. 2. After receiving his other personal items from the TSA x-ray machine, including a fanny pack [Ex. 1 (12:22:38)], the defendant walked with the officers in a relaxed manner, and the officers did not display any force during that, or any, time-period. *See* Ex. 3 (starting at 12:25:11 as they walk to the room, starting at 12:30:58 as they leave). Once questioning began, the officers told

5

him that there would be no further enforcement action, indicating that defendant would be free to leave.[2] *See* Ex. 5, pp. 2, 4. In fact, in response the defendant inquired as to the process to obtain the gun back and his intention in doing so. *See id.* The conversation was always directed solely at the seizure of the gun, not the defendant's detention. While the local police may not have advised he was free to leave, the other circumstances indicate that there were no statements or actions made by them to lead him to an opposite conclusion.

Second, the location of questioning also demonstrates that the defendant was not in custody. Contrary to the police roll call room in *United States v. Charbonneau*, 979 F. Supp. 1177, 1181 (S.D. Ohio 1997) (cited at ECF 20, p. 5), the defendant was interviewed in a private room in the checkpoint area but not handcuffed or otherwise detained, nor taken to a police-dominated location such as a police office at the airport, a police car, or jail cell. Exs. 3 (showing room's location 12:25:11); 5, p. 5 (the defendant was not handcuffed); *see also United States v. Thompson*, 2008 WL 1766934, *5 (M.D. Fla April 14, 2008) ("a de facto arrest does not necessarily occur the moment an individual enters a room beyond the public area of an airport," rather questioning must rise to a distinctly accusatory level, citing, e.g. *United States v. Okelley*, 106 F. App'x 577, 578 (9th Cir. 2004); *United States v. Knox*, 839 F.2d 285 (6th Cir. 1988)). In fact, it appears that the private room's door is open the entire time, and after the interview, both the officers, the TSO, and the defendant all leave in a relaxed manner. *See* Ex. 5 (12:25:11-12:30:58)

---

[2]     This fact is corroborated by the defendant's recorded 30-minute conversation with TFO Exley on February 10, 2022, where the defendant admits after having been provided *Miranda* warnings that "they told me it was a civil charge." *See* ECF 34-2 (Ex. 2 at approximately 25:10). This is direct evidence that the defendant knew this was not a criminal investigation.

6

Third, the nature of questioning and the duration of the interview, six minutes and likely even less, also demonstrate the defendant was not in custody and was never conveyed a message that compliance was required. *See id.* (length of interview). Questioning was limited to why he had the gun and then evolved into a two-way conversation about the process on getting it back. *See* Ex. 5, p. 4, 7. The defendant was not threatened with physical mistreatment and never restrained, and he was actively participating in the limited questioning. *See id.*; *see also United States v. Salazar*, 2020 WL 520941, *33 (D. New Mexico Jan. 31, 2020) (noting that the Tenth Circuit articulated these "hallmarks of coercion" in the custodial context in *United States v. Sanchez-Gallegos*, 412 F. App'x 71, 73 (10th Cir. 2011) (Ebel, J., concurring)).

Fourth, statements made during the interview demonstrate the defendant was not in custody. The defendant justified his possession of the gun—security work and forgetfulness—and then asked how to get the gun back. Exs. 4, p. 2; Ex. 5, p. 2, 4, 7. Moreover, the officers told him that there would be no enforcement action and certainly did not state there would be criminal charges, Ex. 5, p. 2, 4, 7.

Finally, there is no indication there were physical restraints and physical threats during the interview so as to indicate custody. *See* Ex. 5, p. 5 (the defendant was not placed into handcuff). Again, as can be seen by the surveillance video, the defendant and police left the room in a relaxed state, appearing to engage in additional conversation with no visible hostility. Ex. 5 (starting at 12:25:11 and again at 12:30:58). He patiently waited for the bag to be checked one more time by TSA. *See* Ex. 2. These observable actions defy that local police or TSOs used coercion or any other displays of force during the brief

interview. In totality, all the factors weigh toward a finding that defendant was not in custody to require *Miranda* warnings.

## **THE DEFENDANT MADE THE STATEMENTS VOLUNTARILY**

In his motion to suppress involuntary statements, the defendant claims his statements were involuntary. ECF 21, p. 3. The government disagrees.

### I.

"Although '*Miranda* changed the focus of much of the inquiry in determining the admissibility of suspects' incriminating statements,' the Supreme Court 'never abandoned [the] due process jurisprudence, and thus continue[s] to exclude confessions … obtained involuntarily.'" *United States v. Cash*, 733 F.3d 1264, 1279-80 (10th Cir. 2013) (citation omitted). "Thus, even if a defendant is not subject to custodial interrogation—and therefore not entitled to Miranda warnings—his incriminating statements, if involuntarily produced, are inadmissible." *Id*. at 1280. To be admissible, a confession must be made freely and voluntarily and must not be extracted by threats in violation of due process or obtained by compulsion or inducement of any sort. *Id*. at 1281. Voluntariness is judged under an expansive standard:

> Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process

*Culombe v. Connecticut*, 367 U.S. 568, 602 (1961).

The Supreme Court has clarified that "coercive police activity is a necessary predicate to the finding that a confession is not voluntary." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). That determination is based on the totality of the circumstances,

8

including: (1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to any physical punishment. *Cash*, 733 F.3d at 1280. No single factor is determinative. *United States v. Lopez,* 437 F.3d 1059, 1060 (10th Cir. 2006). "[G]enerally confessions are often deemed involuntary in rather extreme circumstances." *United States v. Sanchez,* F. Supp. 3d 1129, 1140 (D. N.M. 2021) (outlining examples). The government bears the burden of proving voluntariness by a preponderance of the evidence. *Cash*, 733 F.3d at 1280.

II.

There is no coercive police activity here. The defendant underwent brief limited questioning lasting no more than six minutes and was told that no enforcement action would be taken, indicating that the conversation was not directed at criminal investigation but rather safety (regulations prohibit anyone from possessing a gun in the airport, whether criminal or not) and at most civil enforcement. The defendant's active inquiry on the process of gaining the gun back shows he was not compelled by coercion by age, intelligence, and education.

There is no indication that the defendant was subject to any physical punishment or restraint. *See generally* all exhibits. The defendant only directly interacted with two local officers and TSO G.B. *See* Ex. 3 (12:25:11-12:34:34). The defendant left the room, where the door appeared to have been opened the entire time, he was relaxed and freely conversing with the local officers, showing in the totality of circumstances that conversations were conversational. *See id.* While numerous other TSA personnel were present throughout, the closed circuit television camera shows they were unarmed and

9

engaged in their duties with other passengers, rarely even directing their attention to the defendant. *See generally* Ex. 3. Fundamentally, the defendant was at a routine security checkpoint designed to identify all passengers and justify their entry on valid boarding passes, as well as screen all luggage to prevent all passengers from possessing weapons on aircraft—that environment, which all commercial aviation passengers in America pass through, is not as inherently coercive as the defendant suggests throughout his motion. *See United States v. Miles*, 16 F. App'x 845, 850 (10th Cir. 2001) (there is nothing unusual or inherently coercive about the presence of three uniformed and armed officers").

There is no evidence that TSA and local police promised anything or threatened the defendant; nor did they subject him to misrepresentations, deceit, or trickery. *See* Ex. *generally* 4 and 5. Asking a direct question—why he had the gun—while seizing that gun in the context of an airport security checkpoint is not coercive as the defendant suggests. ECF 21, p. 4. *See United States v. Toro-Pelaez*, 107 F.3d 819, 826 (10th Cir. 1997) (troopers pointing out cocaine did not compel a finding of coercion).

There is no indication that the defendant's identification and boarding pass were taken from him throughout the conversation, *see* Ex. 5, p. 2, 4, and his inquiry into getting the firearm back indicates that he understood there was no obligation to speak, or that defiance would lead to detention. *See id.* To the contrary, the defendant was likely allowed to retain his other personal items during the interaction, including his "fanny pack," which further suggests that the officers were not restraining him in any significant manner. *See* Ex. 3 (12:25:20, wearing fanny pack as he enters; 12:31:13, wearing fanny pack as he exits and also carrying boarding-pass-shaped paper).

Although the defendant was not advised of his *Miranda* rights, this is "not at all dispositive" because the other factors strongly indicate the defendant's statement was freely given. *United States v. Rith,* 164 F.3d 1323, 1333 (10th Cir. 1999). The allegedly "coercive" acts the defendant cites in his motion are miles away from the kind of police conduct that courts have suppressed. In totality, the defendant made statements voluntarily.

## **CONCLUSION**

Based upon the above arguments, this Court should deny both of the defendant's motions.

    Respectfully submitted,

    COLE FINEGAN
    United States Attorney

    By: *s/ Albert Buchman*
    ALBERT BUCHMAN
    Assistant United States Attorney
    United States Attorney's Office
    1801 California St. Suite 1600
    Denver, CO 80202
    (303) 454-0100
    Al.Buchman@usdoj.gov
    Attorney for the Government

## CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that on February 14, 2023, I electronically filed the foregoing **RESPONSE TO THE DEFENDANT'S MOTIONS TO SUPPRESS STATEMENTS [ECF 20 AND 21]** with the Clerk of the Court using the CM/ECF system, which system automatically provides a copy to defense counsel of record.

                              *s/ Lauren Timm*
                              Legal Assistant
                              United States Attorney's Office