**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 22-cr-00145-PAB

UNITED STATES OF AMERICA,

      Plaintiff,

v.

LEON ASKEW,

      Defendant.

---

**RESPONSE TO DEFENDANT'S MOTION TO DISMISS CHARGE AS
UNCONSTITUTIONAL [ECF 33]**

---

The United States of America responds to the defendant's Motion to Dismiss Charge as Unconstitutional, in which he asserts 18 U.S.C. § 922(g)(1) is unconstitutional, both facially and as applied to him. ECF 33. The defendant's motion should be denied.

## SECTION 922(g)(1) IS FACIALLY CONSTITUTIONAL

The defendant contends that *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), rendered § 922(g)(1) unconstitutional. For that premise, he relies largely on the Fifth Circuit's analysis in *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023),[1] which struck down a different provision, § 922(g)(8). *Rahimi* contradicts this Court's precedent, is unpersuasive, and misconstrues the constitutional text and its history. This Court should decline to follow its analysis.

---

[1]     The defendant cites the February 2023 opinion in *United States v. Rahimi*, 59 F.4th 163 (5th Cir. 2023). After he filed his motion, the Fifth Circuit withdrew and superseded the February 2023 opinion. *See Rahimi*, 61 F.4th 443. The government cites to the most recent opinion.

I.      **The Tenth Circuit has long held that the Second Amendment's reach is limited to law-abiding citizens.**

In *District of Columbia v. Heller*, while recognizing an individual's right to bear arms, the Supreme Court cautioned that "nothing in [the Court's] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . . ." 554 U.S. 570, 626 (2008).  After *Heller*, the Tenth Circuit reiterated that point and upheld the constitutionality of § 922(g)(1). *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009) (citing *Heller*, 554 U.S. at 626). And a year after that, the Supreme Court repeated that *Heller* "did not cast doubt on" felon-dispossession provisions. *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality). Thereafter, the Tenth Circuit has repeatedly rejected constitutional challenges to § 922(g)(1). *E.g.*, *United States v. Griffith*, 928 F.3d 855, 870-71 (10th Cir. 2019); *United States v. Gieswein*, 887 F.3d 1054, 1064 n.6 (10th Cir. 2018); *see also Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1124-25 (10th Cir. 2015) (underscoring the same language in *Heller* in a sensitive-places challenge).

*Bruen* did not displace that conclusion from *Heller*. In *Bruen*, the Court explained that *when* the Second Amendment's text protects conduct, the conduct is presumptively protected. *Bruen*, 142 S. Ct. at 2126. To overcome that presumption, the government must show the "regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Under that framework, *Bruen* invalidated New York's "may-issue" licensing regime. *See id.* at 2134-56. But, importantly, the *Bruen* majority cautioned that the opinion did not call into doubt "shall-issue" regimes that "often require applicants to undergo a background check[.]" *Id.* at 2138 n.9; *accord* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring). Such regimes, many of which prohibit the issuance of licenses to felons, generally pass constitutional muster because they "are designed to ensure only that those

bearing arms . . . are, in fact, 'law-abiding, responsible citizens.'" *Id.* at 2138 n.9 (quoting *Heller*, 554 U.S. at 635).

As relevant here, the *Bruen* majority discussed, no fewer than 14 times, the Second Amendment's right in the context of "*law-abiding*" citizens. *Id.* at 2122, 2124-25, 2131, 2133, 2134, 2135 n.8, 2138 & n.9, 2150, 2156 (emphasis added). The justices made clear that *Bruen* left felon-dispossession statutes untouched. *See id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating that "longstanding prohibitions on the possession of firearms by felons" are constitutional (quoting *Heller*, 554 U.S. 626)); *id.* at 2157 (Alito, J., concurring) (explaining that *Bruen* did not disturb anything *Heller* or *McDonald* said "about restrictions that may be imposed on the possession or carrying of guns"); *id.* at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) (noting the majority opinion casts no doubt on *Heller*'s language permitting felon-dispossession statutes).[2]

Because *Bruen*'s "holding decide[d] nothing about who may lawfully possess a firearm," *id.* at 2157 (Alito, J., concurring), *Bruen* does not abrogate *McCane*'s holding that felons may be categorically prohibited from possessing guns. *McCane*, therefore, remains "the law of this Circuit regardless of what might have happened had other arguments been made to the panel that decided the issue first." *United States v. Baker*, 49 F.4th 1348, 1358 (10th Cir. 2022) (emphasis and citations omitted).

---

[2]     In a previous remand order, Justices Thomas and Gorsuch also agreed that *Heller* "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm," including laws "prohibiting possession by felons and other dangerous individuals." *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of N.Y., N.Y.*, 140 S. Ct. 1525, 1540-41 (2020) (Alito, J., joined by Thomas and Gorsuch, JJ., dissenting). Thus, all told, eight justices have endorsed the constitutionality of felon-dispossession statutes.

Simply put, and as courts have recently recognized, *Bruen* does not cast doubt on the constitutionality of § 922(g)(1).  *See  United States v. Baker*, No. 2:20-cr-301, 2022 WL 16855423, at *3-*4 (D. Utah Nov. 10, 2022); *United States v. Carrero*, --- F. Supp. 3d ----, 2022 WL 9348792, at *4 (D. Utah Oct. 14, 2022). Tenth Circuit precedent forecloses the defendant's claims here, and the Court should deny his motion to dismiss on this basis.

## II.   The Second Amendment's text and history demonstrate that § 922(g)(1) is constitutional.

Even putting aside binding authority from the Tenth Circuit, § 922(g)(1) is constitutional under *Bruen*'s framework. The Second Amendment's plain text does not protect a felon's right to possess a gun, and even if it did, § 922(g)(1) accords with this national's historical tradition of disarming felons.

### a.  The Second Amendment does not guarantee to felons the right to bear arms.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II. By its plain text, then, the Second Amendment applies to "the people."

The Supreme Court has explained that the "the people" are those who are "members of the political community[.]" *Heller*, 554 U.S. at 580. That category doesn't include everyone. "Certain classes have been almost universally excluded" from this definition of "the people," including felons, "on obvious grounds[.]" Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28 (1868), *cited with approval in Heller*, 554 U.S. at 616-18. Indeed, felons have historically been excluded from "exercis[ing] the elective

4

franchise," *id.*, as well as from other, closely related "political rights," like the rights to hold office, serve on juries, and, crucially, bear arms. Akhil Reed Amar, *The Bill of Rights* 48 (1998).

Consistent with this historical meaning of "the people," the Supreme Court has framed the Second Amendment's broad right in terms of "*law-abiding*, responsible citizens." *Heller*, 554 U.S. at 625, 635 (emphasis added); *see also id.* at 644 (Stevens, J., joined by Souter, Ginsburg, and Breyer, JJ., dissenting) (explaining that *Heller* "limits the protected class" in this way). *Bruen*'s majority makes that point more than a dozen times. *Bruen*, 142 S. Ct. at 2122, 2124-25, 2131, 2133, 2134, 2135 n.8, 2138 & n.9, 2150, 2156.

In other words, the Supreme Court has excepted some Americans from the Second Amendment's reach, including felons. Such an exception is "historically grounded and sensible." *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (Sutton, J., concurring in part); *see also, e.g.*, *United States v. Carpio-Leon*, 701 F.3d 974, 979-81 (4th Cir. 2012) (discussing this historical tradition); *United States v. Bena*, 664 F.3d 1180, 1183-84 (8th Cir. 2011) (same); *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) (per curiam) (same); *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) (same).

Given all this, because the defendant is a felon, § 922(g)(1) simply does not infringe upon his constitutional rights.

The defendant counters that "the people" in the Second Amendment encompasses all Americans, *including* felons. *See* ECF 33, p. 6.[3] He cites *Rahimi*, which reasoned that

---

[3]     The defendant also cites *United States v. Carrero*, --- F. Supp. 3d ----, 2022 WL 9348792, at *2 (D. Utah Oct. 14, 2022), for the same proposition, ECF 33, p. 6. Even so, *Carrero upheld* the constitutionality of § 922(g)(1) after a historical analysis.

"[n]either *Heller* nor *Bruen* countenances such a malleable scope of the Second Amendment's protections[.]" 61 F.4th at 453. *Rahimi* relied on the dissent in *United States v. Kanter*, 919 F.3d 437, 452-53 (3rd Cir. 2019) (Barrett, J., dissenting), where then-Judge Barrett disputed Congress's authority to divest anyone of his or her Second Amendment rights.

That premise is flawed; fundamental rights are sometimes limited by Congress. "The commission of a felony often results in the lifelong forfeiture of a number of rights, including the right to serve on a jury and the fundamental right to vote." *Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019) (citing 28 U.S.C. § 1865(b)(5); *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974)); *see also Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998) (felony conviction can include deprivation of the right to hold office). *Heller* also implicitly recognized that the Second Amendment *could* be limited. 554 U.S. at 635 ("*Assuming that Heller is not disqualified from the exercise of Second Amendment rights*, the District must permit him to register his handgun and must issue him a license to carry it in the home." (emphasis added)).

*Rahimi* is of no help to the defendant. In fact, two district courts have already rejected *Rahimi's* application to § 922(g)(1). *United States v. Mason*, No. 4:23-cr-0036-P, 2023 WL 2589395, at *2 (N.D. Tex. Mar. 21, 2023) (distinguishing *Rahimi* because it considered a statute other than § 922(g)(1)); *United States v. Price*, --- F. Supp. 3d ----, 2023 WL 1970251, at *4 (N.D. Ill. Feb. 13, 2023) (observing that "the Second Amendment's plain text does not cover the possession of a firearm by a felon"); *see also United States v. Porter*, No. 22-00277, 2023 WL 2527878, at *3 (W.D. La. Mar. 14, 2023) (distinguishing *Rahimi* in a challenge to § 922(g)(9)).

**b. The Nation's historical tradition of regulating guns includes disarming felons.**

Even if the Second Amendment applies to felons, which it does not, § 922(g)(1) is still constitutional because it aligns with "this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

Again, the defendant relies upon *Rahimi* for a contrary view. ECF 33, pp. 8-10. But again, that case analyzed § 922(g)(8), not § 922(g)(1). At a minimum, § 922(g)(8) is predicated on an individualized danger, yet § 922(g)(1) is a status-based restriction, so the existence or absence of historical analogues to § 922(g)(8) is inapposite here.

Next, the defendant adopts one professor's take that historical disarmament laws applied only to *violent* offenders, yet § 922(g)(1) prohibits even *nonviolent* offenders from possessing guns. ECF 33, pp. 7-8 (citing Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons From Possessing Arms*, 20 Wyo. L. Rev. 249, 251, 274 (2020)). The defendant's sole reliance on Professor Greenlee's assertions proves *Bruen*'s concern that "not all history is created equal." 142 S. Ct. at 2136.

Rather, a comprehensive review reveals this nation's long history of disarming felons—violent or not. Two types of historical laws are particularly pertinent here: (a) laws categorically disqualifying groups from possessing firearms based on a judgment the group could not be trusted to adhere to the rule of law; and (b) laws authorizing capital punishment and estate forfeiture for felons.

**a. Firearm disqualification laws.**

By the time the Second Amendment was ratified in 1791, there was a robust tradition of legislatures exercising broad authority to "categorically disqualif[y] people from possessing firearms based on a judgment that certain individuals were untrustworthy

parties to the nation's social compact." *Range v. Att'y Gen.*, 53 F.4th 262, 274 (3d Cir. 2022) (per curiam), *vacated upon granting of rehearing en banc*, 56 F.4th 992 (3d Cir. Jan. 6, 2023) (unpublished).[4]  Compelling evidence from the constitutional ratification debates confirms that, in light of this longstanding tradition of analogous regulation, the founders also understood that the precise type of regulation at issue in this case is constitutional: A legislature would not, in the founders' view, infringe the right to bear arms by "disarming the people . . . for crimes committed[.]" *Id.* at 280 (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) (emphasis omitted), and discussing Pennsylvania Antifederalists' proposal, *The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787*).

### i.  England

Because the Second Amendment "codified a right inherited from our English ancestors[,]" that country's tradition sheds light on the scope of the Second Amendment. *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 599).  And England disarmed classes of people who, in the legislature's view, could not be depended upon to obey the rule of law.

In 1689, the English government passed "An Act for the better secureing the Government by disarming Papists and reputed Papists[,]" which provided that any Catholic who refused to make a declaration renouncing his or her faith could not "have or keepe in his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other then such necessary Weapons as shall be allowed to him by Order of the Justices

---

[4]     Although the panel opinion in *Range* has been vacated pending rehearing en banc, the opinion's historical analysis retains its persuasive value.

of the Peace . . . for the defence of his House or person).”  1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71-72 (Eng. 1688); *see* Ex. 2 (providing links to historical sources). This statute reflected the government’s perception that Catholics who refused to renounce their faith would have “disrespect for and disobedience to the Crown and English law.”  *Range*, 53 F.4th at 275.  Far from “rest[ing] on the implausible premise that all Catholics were violent,” the statute’s goal was to obtain obedience to the sovereign; a person could regain the ability to keep and bear arms after refusal by making the declaration. *Id.*; *The Statutes of the Realm*, at 72.

This example is particularly illuminating because that same Parliament “wr[ote] the ‘predecessor to our Second Amendment’ into the 1689 English Bill of Rights,” which similarly drew a religion-based distinction, among other limitations.  *Bruen*, 142 S. Ct. at 2141 (quoting *Heller*, 554 U.S. at 593).  It specified that “Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law.” 1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* 143 (Eng. 1688). Thus, while bestowing an individual right to arms, the English government retained the ability to disarm a class of persons who did not show they would abide by the law, whether they were violent or not.

### ii. *Colonial America.*

In the American colonies, classes of those deemed untrustworthy—Native Americans and Black persons—could not buy or possess weapons or ammunition.[5]

---

[5]    These “status-based regulations of this period are” not only “repugnant” and unconstitutional, but also well documented. *Range*, 53 F.4th at 276 n.18; *see, e.g.*, Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 28-29 (2006); *Laws and Ordinances of New Netherland, 1638-1674*, at 18-19 (1868) (1639 New Netherland law); 1 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 255-56 (1823) (1642-43 Va. Law); 5 *Records of the Colony of New Plymouth* 173 (1856) (1675 Plymouth law); 2 *Records of the Colony of Rhode Island and*

Further, "colonial history furnishes numerous examples in which full-fledged members of the political community as it then existed—*i.e.*, free, Christian, white men— were disarmed due to conduct evincing inadequate faithfulness to the sovereign and its laws." *Range*, 53 F.4th at 276.

Massachusetts disarmed supporters of an outspoken preacher in the 1630s, not because they were violent, but because of their "disavowal of the rule of law" and failure to demonstrate "obedience to the commands of the government."  *Id.* (citing Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635, 637-38, 644, 648 (1937); Ann Fairfax Withington & Jack Schwartz, *The Political Trial of Anne Hutchinson*, 51 New Eng. Q. 226, 226 (1978); James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 New Eng. Q. 381, 391 (1988); John Felipe Acevedo, *Dignity Takings in the Criminal Law of Seventeenth-Century England and the Massachusetts Bay Colony*, 92 Chi.-Kent L. Rev. 743, 761 (2017)).

During the French and Indian War, Virginia imported the English tradition of disarming Catholics who refused to take a loyalty oath. *See* 7 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 35-38 (1820) (1756 Va. law).  Like the English law discussed above, Virginians could regain their right to arms, after previously

---

*Providence Plantations in New England* 561 (1857) (1677 R.I. law); 2 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 481-82 (1823) (1680 Va. Law); *The Grants, Concessions, and Original Constitutions of the Province of New-Jersey* 340-41 (1753) (1694 N.J. law); 2 *The Statutes at Large of Pennsylvania from  1682 to 1801*, at 235-36 (1896) (1705-06 Pa. law);  6 *The Public Records Of The Colony Of Connecticut* 381-82 (1872) (1723 Conn. law); *Laws of New York From The Year 1691, to 1751, Inclu[s]ive* 199 (1752) (1730 N.Y. Law); *A Complete Revisal of All the Acts of Assembly, of the Province of North-Carolina, Now in Force and Use* 152-53 (1773) (1753 N.C. law); 6 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 319-20 (1899) (1763 Pa. law).

refusing, by taking the oath.  *Id.* at 38.

### iii.    The Revolutionary War.

Over the course of the Revolutionary War, American legislatures "disarm[ed] non-violent individuals because their actions evinced an unwillingness to comply with the legal norms of the nascent social compact." *Range*, 53 F.4th at 277. These laws often specifically targeted those who failed to demonstrate loyalty to the emergent American government. *See id.* at 277-78. These laws did *not* necessarily only target persons with violent histories.

A 1775 Connecticut law disarmed any person convicted of "libel[ing] or defam[ing]" acts of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies. *The Public Records of the Colony of Connecticut* 193 (1890) (1775 Conn. law).  In 1776, the Continental Congress recommended that the colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort. 4 *Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776).  At least six colonies enacted similar legislation. *See* 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479-84 (1886) (1776 Mass. law); 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862) (1776 R.I. law); 1 *The Public Acts of the General Assembly of North-Carolina* 231 (1804) (1777 N.C. law); *Acts of the General Assembly of the State of New-Jersey* 90 (1777) (1777 N.J. law); 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 112-13 (1903) (1777 Pa. law); 9 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 282 (1821) (1777 Va. law).

Of course, a law disarming those convicted of libeling the government does not "narrowly target citizens who committed inherently violent or dangerous crimes." *Folajtar v. Att'y Gen.*, 980 F.3d 897, 909 (3d Cir. 2020). The Pennsylvania version of this law deprived "sizable numbers of pacifists" of the right to bear arms "because oath-taking violated the religious convictions of Quakers, Mennonites, Moravians, and other groups." *Range*, 53 F.4th at 278. Even more noteworthy, the year *before* the Pennsylvania disarmament law passed, that legislature adopted a state constitutional provision protecting an individual's right to bear arms. *Heller*, 554 U.S. at 601; *see* Pa. Declaration of Rights of 1776 § XIII, *in The Complete Bill of Rights: The Drafts, Debates, Sources, & Origins* 278 (Neil H, Cogan ed., 2d ed., 2014) (hereafter, Cogan).

The right to bear arms was similarly codified—and restricted—in other states, too. *See* N.C. Declaration of Rights of 1776 § XVII, *in* Cogan, at 277-78 (individual rights-based constitutional provision adopted the year before the North Carolina disarmament law cited above); Mass. Const. of 1780, pt. I, art. XVII, *in* Cogan, at 277 (individual rights-based constitutional provision adopted four years after the Massachusetts disarmament law cited above). And the Virginia law required disarmed persons to attend militia trainings without weapons—a consequence that shows that individuals were not disarmed solely for being violent. *See Range*, 53 F.4th at 279; *accord* 1777 Va. law at 282 ("[T]he person so disarmed shall, nevertheless, be obliged to attend musters[.]").

### iv. *Ratification debates.*

The ratification process behind the Second Amendment provides particularly persuasive evidence that the founders understood that groups not trusted to follow the law could be disarmed.

12

One "Second Amendment precursor[]" that the Supreme Court has described as "highly influential," *Heller*, 554 U.S. at 604, is instructive.  When the Pennsylvania ratifying convention met in 1787, a key sticking point was the Antifederalists' objection to the Constitution's "lack of a Bill of Rights."  2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627 (1971). Although the Antifederalists did not persuade a majority of the convention to reject ratification on this basis, the Bill of Rights was adopted four years later—eight provisions of which, including the Second Amendment, echoed those proposed by the Pennsylvania Antifederalists.  *Id.* at 628.  And the Pennsylvania Antifederalists' proposed constitutional amendment regarding the right to bear arms stated that "no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals[.]"  *Id.* at 665 (emphasis added). "The use of the word 'or'" in this proposal reflects that "criminals, *in addition to those who posed a 'real danger*,'" have historically been "proper subjects of disarmament."  *Medina*, 913 F.3d at 158-59 (emphasis added).

Likewise, at the Massachusetts convention, Samuel Adams proposed an amendment providing that the "Constitution be never construed to authorize Congress . . . to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms."  Schwartz, at 675, 678-81 (emphasis added).  And in New Hampshire, the convention recommended an amendment providing that "Congress shall never disarm any Citizen unless such as are or have been in *Actual Rebellion*."  *Id.* at 758, 761 (emphasis added).  These proposals all indicate the prevailing historical tradition of disarming persons outside the trustworthy, law-abiding citizenry, and they cannot be "shoehorn[ed] . . . into the silo of dangerousness[.]"  *Folajtar*, 980 F.3d at 908-09.

To be sure, the Second Amendment does not include the same language as these proposals. But it would have been "obvious" to the founders that certain groups, including felons, Cooley, at 29, could properly be subject to disarmament laws consistent with the "*pre-existing* right" that was "codified" in the Second Amendment, *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 592). In other words, proponents of a constitutional right to bear arms "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" in the debates because the limitation "was understood." Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008); *see also* Amar, at 48 ("So too, the right to bear arms had long been viewed as a political right, a right of First-Class Citizens.").

Given the language of these influential proposals along with the apparent absence of any meaningful founding-era "disputes regarding the lawfulness" of potential regulations disarming criminals, courts "can assume it settled" that such regulations are "consistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2133 (discussing the proper inference to draw from the historical record regarding "sensitive places," which "yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited"). Thus, the founders inherited a tradition under which a legislature has broad discretion to disarm classes of untrustworthy people.

### b.   *Felony punishment laws.*

As the District of Columbia Circuit has observed, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture [as a result of felony convictions] to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158; *accord Range*, 53 F.4th at 280-81 ("*A fortiori*, given the

draconian punishments that traditionally could be imposed" for "non-violent felonies" including larceny, repeated forgery, and false pretenses, "the comparatively lenient consequence of disarmament under 18 U.S.C. § 922(g)(1) is permissible."). Indeed, history demonstrates that felons at the time of the founding would have been exposed to the far more severe consequences of capital punishment and estate forfeiture, making disarmament a comparatively minor restriction in the historical context of the Second Amendment's ratification.

For centuries, felonies have been "the most serious category of crime." *Medina*, 913 F.3d at 158. In 1769, Blackstone defined a felony as "an offence which occa[s]ions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other puni[s]hment may be [s]uperadded, according to the degree of guilt." 4 William Blackstone, *Commentaries on the Laws of England* 95 (1769). Blackstone observed that "[t]he idea of felony is indeed [s]o generally connected with that of capital punishment, that we find it hard to [s]eparate them[.]" *Id.* at 98.

Capital punishment was commonly authorized in the American colonies (and then the states). *Folajtar*, 980 F.3d at 904-05. It was "ubiquit[ous]" in the founding era and was "'the standard penalty for all serious crimes.'" *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., joined by Scalia, J., concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)). Indeed, the First Congress (which drafted and proposed the Second Amendment) made a variety of felonies punishable by death, including treason, murder on federal land, and piracy on the high seas, and also non-violent conduct relating to forging or counterfeiting a public security. *See* An Act for the Punishment of Certain Crimes Against the United States, ch. 9, 1 Stat. 112-15 (1790).

States in the early Republic likewise treated "nonviolent crimes such as forgery and horse theft" as "capital offenses." *Medina*, 913 F.3d at 158; *see* Banner, at 18.

Many American jurisdictions up through the end of the 1700s also authorized complete forfeiture of a felon's estate. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn. 275-76 (2014) (citing statutes). A few examples of state laws demonstrate the severe consequences for committing a felony at the time. In 1788, just three years before the Second Amendment's ratification, New York passed a law providing for the death penalty for crimes including counterfeiting (as well as burglary, robbery, arson, and malicious maiming and wounding). 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)*, at 664-65 (1886) (1788 N.Y. law). The act established that every person convicted of such an offense was "liable to suffer death, shall forfeit to the people of this State, all his[] or her goods and chattels, and also all such lands, tenements, and hereditaments[] . . . at the time of any such offence committed, or at any time after." *Id.* at 666. For other felonies, the authorized punishment for "the first offence" was a "fine, imprisonment, or corporal punishment," and the punishment "for any second offense . . . committed after such first conviction" was death. *Id.* at 665.

Two years earlier, New York passed a law severely punishing counterfeiting of bills of credit. *Id.* at 260-61 (1786 N.Y. law). A felon counterfeiter had to "forfeit all his or her estate both real and personal to the people of this State,  and be committed to the [correction house] of the city of New York for life, and there confined to hard labor[.]" *Id.* at 261. In addition, "to prevent escape," the defendant was to be "branded on the left cheek with the letter C, with a red hot iron." *Id.*

Similarly, in 1777, Virginia adopted a law whereby anyone convicted of forging, counterfeiting, or presenting for payment a wide range of forged documents "shall be deemed and holden guilty of felony, shall forfeit his whole estate, real and personal, shall receive on his bare back, at the publick whipping post, thirty nine lashes, and shall serve on board some armed vessel in the service of this commonwealth, without wages, for a term not exceeding seven years[.]" 9 *The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* 302-03 (1821) (1777 Va. forgery law); *see also, e.g.*, *A Digest of the Laws of Maryland* 255-56 (1799) (collecting Maryland forgery laws, enacted between 1776 and 1778, providing that those convicted "[s]hall [s]uffer death as a felon, without benefit of clergy").

Thus, felony penalties also show that "those convicted of felonies are not among those entitled to possess arms" under the Second Amendment.  *Medina*, 913 F.3d at  160.

### c.    The historical analogues above apply to Section 922(g)(1).

Both sets of historical traditions surveyed above—felony disqualification laws and felony punishment laws—demonstrate § 922(g)(1)'s constitutionality.  *Bruen* calls for an analysis of "how and why" the historical and challenged regulations "burden a law-abiding citizen's right to armed self-defense."   142 S. Ct. at 2133.   As already explained, § 922(g)(1) imposes *no* burden on "a law-abiding citizen's right to armed self-defense" because it only applies to persons outside of the law-abiding citizenry. In any event, legislatures have historically disqualified categories of persons from possessing firearms in the same way as felon-dispossession statutes do today. The legislatures' historical reasons for disarmament include a legislative judgment that certain persons could not be counted upon to be responsible, law-abiding members of the polity—the same rationale

underlying felon-dispossession statutes today.   Moreover, history demonstrates that felons at the time of the founding would have been exposed to the far more severe consequences, making disarmament a comparatively minor restriction in the historical context of the Second Amendment's ratification.

## III.   District courts have consistently upheld § 922(g)(1) *post-Bruen.*

The text of the Second Amendment, its historical underpinnings, and the Supreme Court's guidance all lead to one conclusion: § 922(g)(1) is constitutional. At least 106 district courts in all circuits have upheld this statute post-*Bruen.* Two have upheld it since *Rahimi* was published. *See* Ex. 1.[6] This Court should do the same.

## SECTION 922(g)(1) IS CONSTITUTIONAL AS APPLIED

The defendant also argues that this criminal history is non-violent, there is no historical tradition for disarming similarly nonviolent persons, and therefore § 922(g)(1) is unconstitutional as applied to him. ECF 33, pp. 11-13.[7] He is wrong.

The distinction between a facial and as-applied challenge only goes to the breadth of the remedy. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). The substantive rule of law is the same for both challenges. *Id.*; *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127-28 (2019). So the inquiry is whether § 922(g)(1), as applied to the

---

[6]     The defendant cites *United States v. Harrison*, --- F. Supp. 3d ----, 2023 WL 1771138 (W.D. Okla. Feb. 3, 2023), as a "bellwether[] for the demise" of § 922(g)(1).  ECF 33, p. 5. This case is easily distinguished as it addresses § 922(g)(3), which is not predicated on felony status.

[7]     The defendant also argues that that § 922(g)(1) is unconstitutional as applied to him for self-defense and employment. Even if these circumstances are true, he neglects to mention the important fact that he possessed a gun *in an airport security checkpoint*, a sensitive place. ECF 33, p. 1. *Heller* recognized that "nothing in our opinion should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places . . . ." 554 U.S. at 626; *accord Bonidy*, 790 F.3d at 1126 (denying an as-applied challenge to carrying a gun in a post office, noting "longstanding bans on private firearms in airports").

defendant, is consistent with the text and history of the Second Amendment. *United States v. Coombes*, --- F. Supp. 3d ----, 2022 WL 4367056, at \*10 (N.D. Okla. Sept. 21, 2022). And the defendant's as-applied claim fails as a matter of Tenth Circuit law, which remains intact after *Bruen*. *See supra* pp. 2-4; *In re United States*, 578 F.3d 1195, 1200 (10th Cir. 2009) (unpublished) (explaining that *Heller* does not mandate "an individualized inquiry concerning felons pursuant to § 922(g)(1)" in an as-applied challenge).[8]

Even considering the merits of the defendant's challenge, the historical analogues above demonstrate that violent and nonviolent felons have historically been disarmed. *See supra* pp. 7-17. Thus, no matter whether the defendant is nonviolent, he may still be disarmed under the Second Amendment. *See Medina*, 913 F.3d at 159 ("[W]e see no reason to think that the Court [in *Heller*] meant 'dangerous individuals' when it used the word felon."); *Folajtar*, 980 F.3d at 906-07 (discussing the difficulty in categorizing dangerousness of felonies); *Binderup v. Att'y Gen.*, 836 F.3d 336, 410 (3d Cir. 2016) (Fuentes, J., joined by McKee, C.J., and Vanaskie, Shwartz, Krause, Restrepo, and Roth, JJ., concurring in part, dissenting in part, and dissenting from the judgments) (raising the difficulty in decide *how violent* a felony is), *abrogation recognized in Range*, 53 F.4th at 267.

Regardless, the defendant's history *is* violent. The defendant is an eight-time felon, having been convicted of: (1) second degree assault, (2) use of a controlled substance, (3) possession of a controlled substance with intent to distribute, (4) escape, (5)

---

[8]     The only court of appeals decision holding § 922(g)(1) unconstitutional in any of its applications is *Binderup*, 836 F.3d at 356-57, which discussed the provision as applied to two state-law misdemeanants. The defendant here has been convicted of multiple felonies, not misdemeanors. "[N]o circuit" has ever held § 922(g)(1) "unconstitutional as applied" to a felon. *Medina*, 913 F.3d at 155; *Folajtar*, 980 F.3d at 910.

possession with intent to distribute cocaine base and to distribute cocaine, (6) felon in possession of a firearm, and (7) carrying or using a firearm during and in relation to a drug trafficking crime. *See* Dist. of Colo., 11-cr-00184-WJM, ECF 77 (PSR outlining prior convictions); ECF 103 (judgment).

Notwithstanding his argument directed at his older 1991 second degree assault conviction, *see* ECF 33, p. 12,[9] the defendant's federal convictions in 2011 are violent and dangerous. Congress was aware that "drugs and guns are a dangerous combination" when it enacted 18 U.S.C. § 924(c)(1), under which the defendant was convicted, because the combination creates a "a grave possibility of violence and death." *Smith v. United States*, 508 U.S. 223, 240 (1993); *see also United States v. Goins*, --- F. Supp. 3d ----, 2022 WL 17836677, at *13 (E.D. Ky. Dec. 21, 2022).

## CONCLUSION

The Court should deny the defendant's motion to dismiss.

Dated: March 29, 2023

Respectfully submitted,

COLE FINEGAN
United States Attorney

By: s/ *Albert Buchman*
ALBERT BUCHMAN
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: 303-454-0100
E-mail: al.buchman@usdoj.gov

---

[9] The offense date was February 19, 1991, and the defendant pled guilty to count one. While the government does not currently know the exact provision of the second-degree-assault statute under which the defendant was convicted, all provisions of C.R.S. § 18-3-203 (1986), entail harm to another.

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.

By: *s/ Lauren Timm*
LAUREN TIMM
Legal Assistant
U.S. Attorney's Office